May it please the court, my name is Daniel Romer. I represent the petitioner, Mr. Carlos Silva. We are here today to ask this court to reverse the decision of the Board of Immigration Appeals denying Mr. Silva political asylum. The board has made three or more serious mistakes that bear reconsideration and reversal by this court. The first mistake is a factual one. The board found and held that Mr. Silva had not been threatened. The evidence of record indicates that he was threatened. The second mistake is that they found that he was not persecuted on account of a statutory ground. Again, that is an error of law under this court's jurisprudence. And third, the board has violated Mr. Silva's due process rights by relying on out-of-record evidence, which is not on point and which in any point does not rebut the country conditions. I'd like to address each one of these issues briefly in turn. Mr. Silva testified that he was threatened under this circuit's case law in Lopez, in Del Carmen Molina, and most recently in Garcia Martinez, an applicant for asylum who testifies credibly and where there is no contradiction in his testimony and no refutation of his testimony. That testimony is taken as true for purposes of his asylum eligibility. Again, he testified that at 170 of the administrative record that he was threatened and that he felt threatened, and he provided a foundation for why he was threatened. Specifically, he stated that persons who refuse recruitment by the G-2 military intelligence unit are put on a death list or a blacklist, and they are persecuted by the government. If we were to conclude that there was substantial evidence in the record to support the determinations, the determination of no past persecution and no well-founded fear of future, would any error in connection with the consideration of these other country reports be harmless? In other words, if this Court finds that he was not persecuted? If we looked at the IJ's determined, the BIA's conclusions with respect to past persecution, whether what happened to your client amounted to persecution, and the conclusion flowing from that, that there was no well-founded fear of future persecution, would any error by the Board's consideration of material that your client obviously didn't have an opportunity to respond to, would that be harmless? I suppose it would. But I'm going to convince you that that is not the case, if you'll allow me. That's why you're here. The first issue, then, is whether he was threatened. He testified that he was threatened. And under this Court's jurisprudence, that is taken as fact and supports his ---- Does the qualitativeness of the threat, even if you believe that he believed that there was a communicated threat, matter? Judge Rimer, I don't believe that the Court's decisions include a discussion of whether it needs to be ---- what kind of a foundation it needs to have, whether there needs to be background, and how believable it needs to be. As a practical matter, I think that's a very reasonable consideration. Assume that, and I think the judge did believe that he believed that there was a threat implicit in the conduct. But there wasn't, in this case, unlike most cases, a communicated threat of serious harm. It was just all very implicit. I understand your question. The Court recently addressed that exact issue in Garcia-Martinez footnote 1, where that issue was discussed. And they said, well, there's evidence and there's evidence. Just because he says it's true and he believes it doesn't mean it's true. The Court went on and said, well, quoting Lopez, and I believe quoting Del Carmen Molina, said, for the purposes of asylum eligibility, the fact that that person testifies as to these facts, that is true. Now, I think it's a stronger case where you have a foundation and when there is documentary evidence that supports the threat. And we have that in this case. He was asked why, on both the record and I believe cross-examination, why he feared the threat. And he said because the G2, otherwise known as the death squads, because they make lists of people and they persecute them. And they go into their houses at night and they take them out and they shoot them or they kill them or they torture them. So he has foundation. We also have documentary records in this record that states that this blacklisting process was the modus operandi of the death squads, that that's what they did and that's how they identified their enemies and that's how they came after them. Question, does the G2 operate death squads or is it one of the same? It was the death squads. It's one of the same. They collected information and that evidence is part of the record. At Administrative Record 233, there is a sworn declaration excerpted from a human rights group that actually quotes a member of the death squad. But I want to get back to your question about is this a threat or is this a threat under the law of this circuit? And we look to Ruano and Reyes-Guerrero and Lim where they say, okay, we realize that if somebody testifies credibly that they were threatened, that that really flips the burden of proof. And the government then has to prove that the country conditions are such that the conditions have changed and the person doesn't have a well-founded fear of persecution. And so what they said is, well, just saying threat, that may not be enough, but where the person has, and they enumerated several factors in the disjunctive, and they said, well, where a person has been forcibly recruited, where the person has been pursued, when there's been a close confrontation, face-to-face confrontation, and both Reyes-Guerrero and another case state that where the person has had to relocate, where they've tried to avoid the persecution and they've relocated, that those factors actually constitute actual past persecution that should trigger the presumption. So we have his testimony, we have country conditions documentation that supports it, and we have the law of this circuit that says that that is a threat. Now, there are also cases, Del Carmen Molina being the most obvious one, where such threats have been held to be threats that trigger the presumption. And in Del Carmen Molina, which was cited by this court twice before when it granted this case, before it was remanded, this court cited Del Carmen Molina where a person also was persecuted and where the persecutor tried to recruit the individual. And the threat in that case was that the guerrillas were aware that this person had some family members on the other side, and the threat was some kind of a note saying, I can't remember exactly what it was, but we want to talk to you, we want to talk to you. And she testified that she considered that a retaliatory threat, and the court held that that was a threat. So that's the closest case that we have in terms of lining up the fact. I can see my time is expiring. I'd like to make one quick point about the country conditions and the change in the burden of proof. Mr. Silva is entitled to a decision based on this record. The government has not submitted any country conditions documents to rebut the presumption. It is their burden to do so. They've gone ahead and attached a document on remand to the BIA. That document purports to rebut the past persecution of fear, but it actually supports it because it says, if you parse the language in that, that document says that the government hasn't changed, that there are some proposed changes, but as of June 2003, that those changes are not in effect, and that the government security apparatus continues to conduct itself in keeping with its Cold War mission, which the United Nations mission which conducted this survey felt was inappropriate to its current mission. So with that, I'll preserve my time. Thank you. Fairway. Mr. Chancellor. May it please the Court. I'm Lyle Jentzer. I represent the Respondent today. I am from the Department of Justice. To be eligible for asylum, Silva Jacinto must demonstrate that there's a well-founded fear of persecution on account of a political opinion. On remand from this Court, the BIA found that he met neither of these requirements. In addition, found that even if he had demonstrated past persecution, the presumption that he had a well-founded fear of persecution had been rebutted by a change of country conditions. The BIA decision is, in fact, supported by substantial evidence, and there's certainly no evidence in this case that compels an opposite conclusion. This Court should, therefore, uphold the BIA's decision.  And I'm not going to ask for anyone to rely on a country conditions report that wasn't part of the record. Was it? No, but there's – this case has kind of an interesting twist in that regard, in that when it was remanded back down, it was simply remanded citing Ventura. Ventura talks about a change of country conditions. When the service – that – when the service submitted its record, its appeal, they specifically referenced the change of country conditions. There was no dissent from my opponent. He should have at that point, if he didn't believe that was proper, he could have rebutted it, he could have told the BIA this is improper. He failed to do that. He failed to exhaust his administrative remedies. This is akin, logically, to a motion to reopen on change of country conditions. When you get this type of a remand, and the service, the ICE, specifically referenced a change of country conditions and, in fact, referenced a decision from this Court, which is in the public domain, it's a public record, and there's no rebuttal whatsoever. Yeah, and also says that there's got to be individualized application and all sorts of things which require development on a real record. Well, that also goes to the other document that the CIS – I'm sorry, that ICE submitted. This was a CIS evaluation of country conditions. And if you read that very carefully, and that was in the record, there was no rebuttal to it, they're saying 13 years later, someone who was not forcibly recruited into G2, that's not the evidence here, who was requested on several occasions to join G2, or would you like to, it would be a very good opportunity for you, who has no other knowledge of G2. That report says there's no indication anyone like that would ever be in trouble with G2. And the BIA said, we have a soldier who was honorably discharged. He served his time. There were no threats made to him, no overt threats. There's nothing in the record that would indicate that G2 would come after someone like him. That is an individualized application of the record to him. But he had no opportunity to controvert. Well, he did. He could have asked the board, he said, it's improper for you to consider this. I would like a chance at rebuttal. He did none of that. You know, someone – I just find this curious. I was on a calendar about two months ago, and this very same thing happened. I was on a calendar about two months ago, and this very same thing happened. And the petitioner asked the BIA to remand to the IJ so he could respond, and they denied the motion. And the petitioner asked the BIA to remand to the IJ so he could respond, and they denied the motion. What possible harm could come to the board by giving a petitioner an opportunity to respond? Well, in the case that you're talking about two months ago, I can't answer that. I don't know why the board did what it did. In this case, he didn't ask for that opportunity. He didn't exhaust. Had he exhausted and the board said, absolutely not, we're not going to give you this opportunity, that would be one thing. But that's not what we have here. We – what we have is a failure to exhaust. If the court were to find that's not the case, then the appropriate remedy would be to remand back down to give him a chance to rebut this. But, of course, when we had the original remand under Ventura, certainly the service and the BIA believed that that was part of what the remand was for. That's what the remand in Ventura was. In the record specifically when the case went back down – and, by the way, that's a recording device in front of you. If you keep bobbing and weaving, we're not going to hear your voice on the recorder. Can you point specifically where in the record the BIA put the Petitioner on notice that when the case went back to it, it was going to consider these new country reports? The BIA did not say anything. What we have is the ice. I thought you just argued that. No, what we have just argued that the BIA put the Petitioner on notice and he had an opportunity to respond. No, Your Honor. Ice submitted a brief which specifically referenced change of country conditions. That went to the BIA. That brief was served on. Mr. Silva, Mr. – And that brief asked the Board to consider the new country reports? Yes. Yes, it did, Your Honor. If you wish, I could get you the site of where that brief is in the record. It's at the very beginning. Why don't you just provide it to the clerk when you're done? Okay, Your Honor. But, yes, that is the case. It was in Ice's brief. They specifically referenced that they were bringing out this change of country conditions and there was no rebuttal to it. Now, understood that had there been a rebuttal or had Mr. Silva Jacinto asked, I'd like a chance to rebut this, and the Board had said no, that would be one thing. But that's not what we have here. I understand your argument. The more important argument, though, and this is sort of the 800-pound gorilla, which is sitting on our shoulder and has not been addressed yet, is the Supreme Court decision in Elias Zacharias, because this case is factually indistinguishable from Elias Zacharias. In both cases, we had someone coming up to a person in Guatemala trying to recruit him. He said, I don't want to do it. And they said, think about it. We will be back. That's almost an exact quote from what we have here. And the Supreme Court specifically said that is not enough. In his dissent from the original petition and rehearing, Judge Noonan referred to Elias Zacharias as well. To establish an eligibility for asylum, an individual must show both that he's been persecuted or well-founded fear of persecution and that it is on account of one of the five considerations, one of which and the one that's in question here is political opinion. Now, of course, there can be many reasons for not wanting to join a group or not wanting to go to war. It could be I just want to go back to my wife, I just want to go back to my civilian profession, which is exactly what Silva Jacinto told the Army here or G2 here. Now, again, the term forcible recruitment has been used several times, and there was a forcible recruitment at the very beginning into the Army proper, which Silva Jacinto did his duty and was discharged. About a few months prior to that, his CO simply came up to him and said, I have a pretty good opportunity for you. Would you like to go into G2? Silva Jacinto said, no, I would not. And the CO said nothing further. Once or twice again, they mentioned it, but it was always in the concept of this is a great opportunity. The money would be good. There was never any kind of an implied threat. You must do this or think about your family, think about your welfare, think about your health. Nothing at all like that. They asked when the recruiters came to the restaurant where Silva Jacinto worked. They sat down with him. Tell us what's going on. Would you? We've got this opportunity for you. You're a good typist. You're a good soldier. This would be very good for you. He said no. And they left. That's all we have. We're not even sure on this record if there is an implied threat. He calls this an interrogation. This is no different than when someone leaves our Army and your CO will talk to you at the end. Would you like to go into the reserves? You're a good soldier. How about re-upping? Yes, there may be some persuasion, but no different than the persuasion that was used in Elias Zacharias. This case is indistinguishable from that. There's just simply no showing, not only of no persecution, but even if this Court were to accept there were threats, that these requests for recruitment were threats, it would still have to find it's on account of a political opinion. There's just no indication G2 had any inkling of Mr. Silva Jacinto's political opinions or that they felt that's why he was turning them down. All we know is he told them, I want to go back to my wife, and they did nothing. No one ever heard him. And when he came to the United States, he was specifically asked, are they still looking for you? The answer is no. On those circumstances, we just don't have persecution on account of a political opinion, provided the Court, and I see my time's up just to one sentence conclusion, provided the Court finds that there may have been, and the Court finds, as Your Honor has intimated, that there may have been error by the BIA not giving proper notice on the changed country conditions. We would ask that this case be remanded back to the BIA to give them that opportunity. That should be the solution here. That's two sentences. And I'll add a third. Subject to your questions, I thank you, and that concludes my argument.  Mr. Romer. I'll speak quickly here. I have a lot to say, and I'll do it in my one minute. First of all, under the Getachew decision, the only notice to a party about changed country conditions can come from the Board. There was no notice from the Board in its remand letter.  Secondly, the counsel for the government asked the Board to remand when the Ventura decision sent this case back down to the Board. It said at page 18, and again at page 19, footnote 14, the Board should remand the record to the IJA to determine whether a response to fear is well-founded under the present country conditions in Guatemala, and again, to determine whether a responder presently has a founded fear, the Board should remand the case for this whole basis. The Board did not do so. We had noticed at that point that the Board was not going to consider this issue. The Board's overreaching and grabbing a Ninth Circuit case and citing that is impermissible because it's not part of this record. It's not record evidence. I would ask the Court to look at page 26 where we distinguish the Elias Zacharias facts. This is not Elias Zacharias. The applicant in Elias Zacharias had no political opinions. There was no record evidence that the government had any interest in him for political reasons, and there was no testimony as there is here as to the account of issue. And it's clear in Del Carmen Molina that the testimony about on account of is the same as the testimony about the threat. Lastly, I would close with Del Carmen Molina's conclusion, the BIA's determination that the guerrillas' interest in Molina did not amount to persecution but rather to an interest in the guerrillas in recruiting here was not supported by reasonable, substantial, and probative evidence. The facts are similar here. The threat was similar. Thank you very much for your time. Thank you, Mr. Romer. The matter just argued will be submitted. And we'll next to your argument in the Riley matter. Good morning. Good morning. May it please the Court, I'm Michael Fischotta from the Federal Public Defense.
judges: Rymer, Hawkins, Brewster